COMMONWEALTH OF MASSACHUSETTS

WORCESTER, SS                                         WOCV_____

                                                                        14  1925 B

HECTOR L. MANGUAL,                    )
            Plaintiff                          )
                                                )
v.                                              )
                                                )
                                                )
THE CITY OF WORCESTER, a municipal    )
Corporation, WORCESTER CITY            )               RECEIVED
WORCESTER CHIEF OF POLICE GARY    )
J. GEMME, DETECTIVE SGT. MATTHEW )            OCT 2 3 2014
EARLY, DET. MICHAEL HANLON,        )
DETECTIVE KELLEN SMITH, DET.        )            CLERK OF COURTS
DANA RANDALL, LT. FRANCIS ASSAD  )            WORCESTER COUNTY
                                                )
            Defendants                     )

<u>COMPLAINT AND DEMAND FOR JURY TRIAL</u>

INTRODUCTION

1.    This is an action by Hector Mangual seeking relief for violations of his civil and privacy
      rights under the Constitution, statutes and common law of this Commonwealth by
      officers of the Worcester Police Department on October 24, 2011. The officers subjected
      Mr. Mangual to a warrantless strip search in public and to make him submit they beat
      him while he was handcuffed.   When these searches failed to produce any contraband,
      the officers maliciously charged Mr. Mangual with crimes he did not commit and brought
      him to the police station. There they punched and slammed him, kneeled on his back,
      and twisted his handcuffed wrists to inflict pain and induce submission as they stripped
      him and conducted a warrantless body cavity search of his rectum.

JURISDICTION

2.    Plaintiffs bring this action pursuant to: the Massachusetts Civil Rights Act, M.G.L. c. 12,
      §§ 11H-11J; the Massachusetts Privacy Act, M.G.L. c. 214 § 1B; and the Common Law
      of torts. This Honorable Court has original jurisdiction of the action generally pursuant to
      M.G.L. c. 212, §§ 3 & 4.

3.    There is no reasonable likelihood that the plaintiff's recovery will be less than or equal to
      $25,000.

## PARTIES

4. Plaintiff Hector Mangual ("Mangual") resides in the Concord, Middlesex County, Massachusetts.

5. Defendant City of Worcester ("the City") is a municipal corporation duly organized and chartered under the laws of the Commonwealth of Massachusetts, with its place of business at 455 Main Street, City of Worcester, Worcester County, Massachusetts.

6. Defendant Gary J. Gemme ("Gemme") was at all pertinent times a duly sworn police officer and the Chief of the Worcester Police Department ("WPD").

7. Defendant Detective Sgt. Matthew Early ("Sgt. Early") was at all pertinent times a duly sworn officer and detective of the WPD in its vice squad.

8. Defendant Detective Michael Hanlon ("Hanlon") was at all pertinent times a duly sworn officer and detective of the WPD in its vice squad and an attorney at law.

9. Defendant Detective Kellen Smith ("Smith") was at all pertinent times a duly sworn officer and detective of the WPD in its vice squad.

10. Defendant Detective Dana Randall ("Randall") was at all pertinent times a duly sworn officer and detective of the WPD in its vice squad.

11. Defendant Officer Lt. Francis Assad, ("Lt. Assad") was at all pertinent times a duly sworn officer and a Lieutenant at WPD service division.

12. Each individual defendant is sued in his individual and official capacities.

## FACTS

13. Each of the foregoing paragraphs is incorporated as if fully set forth herein.

14. At all relevant times the City was the employer of each individual defendant.

15. At all times pertinent hereto Gemme, as Chief of Police, exercised authority over the WPD and its officers and was a maker of policy as to standards of conduct and discipline within the WPD, and he had the power to discipline, including the power to effectively recommend dismissal of officers, and the power, authority, and duty to hold officers accountable for any use of excessive or unjustified force and for misstatements of fact in official reports.

16. At all times pertinent hereto the each individual defendant acted under color of law in his capacity as a police officer and/or policy maker of the City and pursuant to the statutes, ordinances, regulations, policies, customs, practices, and usage of the Commonwealth of Massachusetts and/or the City of Worcester.

<u>Assault, arrest and body cavity search of Hector Mangual</u>

17.    On October 24, 2011 at 4:51 pm, Mangual was unlawfully stopped and searched without a warrant while walking at the intersection of Sycamore and Main Street, Worcester, by a group of plainclothes detectives that included Sgt. Early, Smith, Hanlon, Carlson, and Williams and who were subsequently joined by Randall.

18.    Randall prepared a report of the incident, which his supervisor Sgt. Early supplemented with his own report.

19.    Randall's report stated that a confidential informant had provided him information about Mangual.

20.    Randall reported that he and other detectives found Mangual near Main and Sycamore Street and that "with our badges clearly displayed and verbally stating 'Worcester Police may we speak with you for a moment' myself, Det. Sgt. Early, Det Smith, Det. Carlson, Det. Williams (sic), Det Hanlon made contact with him."

21.    This was false because Randall was not present when the other detectives first made contact with Mangual by rushing and physically detaining him before identifying themselves as police.

22.    Randall also falsely reported that when detectives spoke to Mangual he "became immediately belligerent making furtive movements towards his waist area stating 'what do you guys want, why are you fucking with me.' Mangual was instructed to cease his tumultuous movement."

23.    In fact Mangual asked the detectives why they were restraining and frisking him and they falsely told him that he fit the description of an armed robber.

24.    Mangual's wrists were cuffed behind his back, and Sgt. Early with Smith and Hanlon took him to a private driveway at a used car dealership and placed him between cars parked in there.

25.    At no time did Mangual consent to any strip search or body cavity search by the officers.

26.    The detectives pulled Mangual's pants down, yanked up hard on his underwear and began searching and looking at his genitals and his buttocks.

27.    Hanlon pressed with his fingers on Mangual's butt cheeks.

28.    Smith punched Mangual in the rib cage area three or four times and kneed him in the leg in the presence of Early and Hanlon.

29. Mangual screamed in pain, "Why are you hitting me?"  and he called out to passersby "Help me, they're hitting me."

30. Smith told Mangual, "You fucking punk, I'm going to knock your teeth off if you don't shut up."

31. Police also forced Mangual to squat and put his foot on the bumper of a vehicle to facilitate the search, but they found no contraband.

32. Randall, who was not present during  the foregoing searching and beating of Mangual, wrote in his report that the officers merely did a "pat frisk" of Mangual as he yelled "don't fucking sexually abuse me."

33. When their first search and beating of Mangual produced no contraband Sgt. Early, Hanlon and Smith forced him toward a trailer that served as the office of the dealership, stating that they would search him in the trailer, as Mangual continued his protests.

34. In his report Sgt. Early described this location as a place of business restroom at Main and Sycamore Street.

35. As the detectives brought Mangual to the trailer Smith they attempted to slam Mangual's head against a wooden beam but Mangual was able to move so that his shoulder struck the beam instead.

36. Detectives removed his clothing with gloved hands and began to spread his butt cheeks.

37. A number of individuals walking about at the corner of Sycamore and Main Street began yelling at the officers, "Hey that's not legal." "Hey, why are you hurting him?"

38. Police repeatedly told such persons to move on or they would face arrest.

39. Sgt. Early, Hanlon and Smith decided to take Mangual in between two dumpsters in the area to try searching him again, still in plain view of pedestrians on Main Street.

40. He was told to "make it easy" because they were going to strip him, and Mangual heard that a police wagon was on the way.

41. Mangual heard Sgt. Early speaking on a two-way radio with an individual who on information and belief was Randall, who asked: "What you got?"  to which Early replied, "Nothing, he's cleared."

42. At this time Mangual spotted Randall standing at the corner of Main Street approximately 90 feet away.

43. The searches of Mangual produced no drugs, just a fake gun and a small steak knife that Smith confiscated without incident.

44. Randall, who reported that Mangual was somehow flailing his handcuffed arms, also wrote in his report a purely fictional account of a physical altercation between himself and Mangual during which Randall – not Smith – confiscated the steak knife.

45. Though Randall had not participated in the detaining and handcuffing of Mangual, his report states: "When the undersigned attempted to handcuff him, he violently pulled away and continued to scream for observers to get involved and help him get away. At this time I felt a sharp object sticking me from his right pants pocket and found it to be large steak knife which was very sharped. Fearing for Mangual in his violent struggle would gain control of the knife and to harm to myself or other Det present I utilized a standing arm bar so that I could safely place Mangual in handcuffs behind his back and the handcuffs were double locked for his safety when it was tactically possible."

46. Having thus far failed to find illegal drugs on Mangual despite a warrantless, unconsented to and intrusive search, Randall maliciously and falsely arrested Mangual for being a disorderly person and disturbing the peace in order to take him to the police station for conduct a warrantless body cavity search.

47. Randall stated falsely in his report that that Mangual agreed to a strip search by saying, "Let's do it where there are cameras at the station" but at no time did Mangual make any such statement.

48. When Randall finally came over to speak with Early, Mangual and others. After Mangual had been searched three times, Randall told Mangual,"Listen, give me the fucking stuff and I'll make sure you get $40.00 bail."

49. The police dispatch demonstrates that a Vice squad officer (# 160) requested a wagon to Main and Sycamore Street for a vice squad arrest.

50. But instead of being transported in a police patrol wagon as per WPD regulations, Mangual was transported by Sgt. Early, Randall and Smith in a small SUV vehicle.

51. When Mangual asked why he was not transported in a police wagon Sgt. Early told him: "Oh, no, were bringing you to the station and were stripping you."

52. At the Worcester police station when officers brought Mangual into the sally port next to the booking area, he heard Sgt. Early say "Shut the camera off."

53. Mangual was brought into an interrogation room next to the booking desk in the WPD service division.

54. None of the initial conversations and interactions between Mangual and police were recorded despite the technical ability to do so.

55. Besides Sgt. Early detectives present included Randall, Hanlon, Smith, and Lt. Assad.

56.  At all times material to this complaint the WPD Policy 720, a six-page document effective as of January 3, 2008, regulated strip searches.

57.  The policy provided that "normally strip search at the scene of an arrest is not necessary."

58.  Policy 720 states a strip search refers "to the removal or rearrangement of a subject's clothing in order to permit inspection of his or her private areas, genital, pubic area, buttocks and female breast, without any scrutiny of his or her body cavities."

59.  Policy 720 also distinguished between a "Visual body cavity search" and a "Manual body cavity search."

60.  A visual body cavity search encompassed a visual inspection of the anal and genital areas with those areas being opened and manipulated by the individual being searched.

61.  Policy 720 described a manual body cavity search as the "most intrusive, involves some degree of touching and probing of body cavities."

62.  Policy 720 stated: "It is not considered a manual body cavity search (necessitating a warrant) if the police are able to persuade the subject to remove the item."

63.  The policy further provided: "It is also not a manual probe if police are able to remove the secreted object without touching the body cavity (e.g. a visible package of cocaine protruding from the subject's "butt cheeks" that officers can snatch without manipulating that anal region)."

64.  Policy 720 provided in unmistakable language that: "Manual body cavity searches shall only be conducted by medical staff at a local hospital and upon approval by the officers' supervisor."

65.  Policy 720 provided the following language: "Authority: A manual body cavity search may only be conducted pursuant to a search warrant, issued by a judge, based on a strong showing of particularized need supported by a high degree of probable cause." *Rodrigues v. Furtado,* 410 Mass. 878 (1991).

66.  Each police officer and police supervisor who came in contact with Mangual on October 24, 2011, knew that a warrant was required for a manual body cavity search.

67.  The Policy required a police supervisor to make the determination whether or not a strip search and/or body cavity search should be conducted. P. 2

68.  Policy 720 required that a "Supervisor will ensure that every provision of this policy is complied with in those cases where a strip search, visual body cavity search and/or a manual body cavity search is to be performed."  P. 2

69. WPD supervisors were responsible to review and forward the report of a strip of body cavity search through the proper channels to the Chief's office within 24 hours of the search. P. 2.

70. Policy 720 allowed strip searches but provided that they be done in a private room, or in a police wagon, when an officer had probable cause to believe that the subject might be armed.

71. The policy required that strip searches and visual body cavity searches be conducted in a non-humiliating, professional manner, and only for legitimate law enforcement or public safety objectives.

72. The policy provided that no strip searches and/or visual body cavity searches be conducted on camera or in the presence of non-police personnel.

73. The policy provided that the WPD Service Division supervisor be present for strip searches.

74. Lt. Assad was the "official in charge" at WPD service division at the time officers performed a body cavity search on Mangual.

75. The policy required that, "video monitoring tape shall be turned on prior to the performance of the strip search and/or visual body cavity searches, and the supervisor will then relay what actions are being taken so that they may be recorded via audio portion of the camera monitoring system. It is imperative that at all times that the prisoner remain outside of the video camera range." P. 4

76. As to manual body cavity searches the police required that "[o]nly a qualified medical professional, pursuant to a warrant may conduct an intrusion of a body cavity, or extract any items from a body cavity. After the warrant is issued, the arrested person shall be transported to a medical facility so that a qualified medical professional may extract any items from the body cavity."

Mangual's undergoes a body cavity search of his rectum

77. On October 24, 2011, Mangual was brought to an interrogation/holding room at the service division at 4:27 pm.

78. An audio video recording from the area just outside the interrogation room captured no images of Mangual during the search but his voice is clearly audible, and Early, Smith and Hanlon can be heard and are seen much of the time.

79. Mangual, fearing that the beatings he got on the street would resume, insisted, "I want to stay in front of the camera. . ."

80. Sgt. Early told Mangual "We're not allowed."

81.     Smith is seen on the video tape wearing dark leather gloves and Hanlon and Early are seen wearing latex-type surgical gloves.

82.     Shortly after Mangual was brought handcuffed into the interrogation room, Mangual yelled "What the fuck man, ahh" and calling the detectives "Fucking freak."

83.     Mangual screamed "fucking assholes" as Early told him "Hector, stop resisting, stop it."

84.     Mangual yelled "Put the fucking camera on" and "You guys are fucking abusing me."

85.     At 4:28 pm. Early can be heard saying: "Let us start the search . . .Spread your legs Hector."

86.     Mangual again asked to be put on camera and for officers to "cover my face."

87.     At 4:28 pm. Sgt. Early suggested to Mangual, "If you just do what you're asked . . . It's just simple, like Simon says . . ."

88.     The WPD use of force policy forbids the use of excessive force and forbids any type of abusive conduct towards an arrestee.

89.     At 4:28 pm, Mangual screamed "The fucking guy is on my back, I can't fucking breath man."

90.     As Smith and Hanlon continued to force themselves on Mangual, Mangual reiterated, "I can't breath, the handcuff is cutting my wrist."

91.     Sgt. Early told Mangual, "This is the first you complain about your wrists."

92.     After additional force was applied Mangual yelled: "You mother fucking . . . There is no reason for you guys to be fucking hurting me . . . bro."

93.     Early stated, "Were not hurting you, calm down and relax." Early made this statement knowing it was false.

94.     The video shows officer Hanlon against the wall in a seated position, as Early instructs Mangual to "remain calm and spread your legs."

95.     Mangual continued: "All right bro, you're hurting me" at 4:29 pm.

96.     When Early told Mangual "Your hurting yourself by resisting, stop tensing and relax" Mangual said "What the fuck man."

97.     At 4:30 pm either Hanlon or Smith told Mangual "Hector we asked you out in the street to do this and you resisted."

98.     The next audible commentary involves Early narrating: "Were trying to take your pants off."

99.     Immediately after, Mangual screamed "You people are fucking crazy I swear to God, you people are fucking nuts"

100.    Early next instructed Mangual to turn and face the wall.  Early said, "Just do what you're told."

101.    Mangual replied "I got a choice but you're stepping on me kicking me."

102.    Early falsely responded in order to cover up for Smith and Hanlon's conduct by stating "No one's kicking you." Early made that statement knowingly.

103.    After Early asserted that no one was kicking Mangual,  Mangual immediately responded "Bro' you slammed me on my face man, swear man, in my fucking face, you slammed me... There's no camera's here bro, no fucking camera ahh."

104.    Mangual next said, "You guys lie, specially lie, the whole side of my face . . . Lie the hole fucking time."

105.    At this time Mangual's pants and underwear had been completely removed.

106.    At 4:31 pm as Sgt. Early can be heard narrating, "Were' searching his pants now."

107.    At or about this time Kellen Smith is visible and wearing a red jacket, as Mangual said "Look my hands are turning blue ..."

108.    Mangual also said, "Look at my wrist officer...  Look at the wrist man."

109.    At about the same time Dana Randall becomes visible in the video.

110.    At 4:31 pm Mangual insisted: "Look at my wrist man" and demanded "I want to see a doctor."

111.    Early facetiously questioned Mangual "Why do you want to see a doctor?"

112.    Mangual retorted "You keep slamming me on my face officer."

113.    Early replied "Nobody did that."

114.    At 4:32 pm. Smith told Mangual "And all this is a game...It's all a game, go with the program yelling screaming ... Yelling and screaming that people are hurting you and they're not."

115.   Immediately, Mangual replied: "And you banged me brother."

116.   By "banged" Mangual was verbalizing that he had been punched.

117.   As the officers used more force to make Mangual comply, Mangual said, "No man, common man with that shit, what are you doing?"

118.   At 4:32 pm., Early told Mangual "Spread your cheeks, you've been searched before you know the procedure."

119.   Mangual replied "This is fucking embarrassing, Common man."

120.   At the same time when Early told Mangual "Hector stop." In turn, Mangual replied "Why are you twisting my wrist."

121.   Smith was purposely using pressure points to inflict pain on Mangual.

122.   At 4:33 pm Mangual began to yell, moan and cry, "My fucking wrist, Ah my wrist."

123.   Even though Early knew Mangual was being abused and that it was impossible for him while handcuffed to spread his butt cheeks, he told Mangual: "Your very good at it Hector."

124.   Hanlon was trying to open with his hands Mangual's butt cheeks.

125.   At 4:33 pm, Early bent his body toward the cell and questioned as Hanlon hands were in Mangual's anal area, "You got it?"

126.   At 4:33 pm, Early reiterated: "When you see a baggy protruding from his butt …tell me" as Mangual continued to scream in agony "Ah, my wrist."

127.   No baggy was visible or protruding.

128.   Seconds later, Early told Mangual, "Hector is there, the games up, you're going to jail."

129.   Hanlon forcefully spread Mangual's butt cheeks and inserted his fingers into Mangual's rectum while Smith twisted Mangual's writs and he screamed: "Ah, my wrist."

130.   At 4:33:32 pm, Early continued to insist that Mangual stop fighting as he looked away from inside the interrogation room.

131.   Either Smith and/or Hanlon told Mangual, "Spread your cheeks Hector," knowing that with handcuffs it was impossible for him to do so.

132.   Mangual continued to scream in agony, "Ah my wrist."

133. It was only then, that Hanlon and/or Smith said "It's protruding out there, protruding."

134. Early immediately replied: "Yeah, I know, I said that, I can see it from here," as he leaned into the room to get a better view of something he had thus far been unable to see.

135. Early continued: "Spread your cheeks" as Mangual continued to wail in agony "Ah, my wrists."

136. At 4:33 pm, Early stated, "Hector, games up, I can see it from here."

137. It was at that time that contraband was manually removed from Mangual's rectum by Hanlon as Hanlon said "Got it."

138. At 4:34 pm, Mangual continued to scream, "Are you serious man?"... "Stop fucking violating me..." "What are you fucking doing man?"... "Why are you [Early] letting them do this to me man?"

139. As Mangual continued to complain Early told Mangual "No one has touched you relax..." "Stop resisting."

140. When Early told Mangual "No one has touched you," he made it knowing that it was false.

141. Mangual immediately replied "Now he hit me."

142. Early responded: "Stop resisting, no one's hitting you."

143. At this time Lt. Assad peeked through the interrogation room as Mangual proclaimed "Common man, your fucking serious!"

144. At approximately 4:34 pm. Mangual began wailing and screaming: "Ah, your banging my ass," . . . "What the fuck are you doing?"... "You're fucking violating me."

145. It was at this time that Early falsely proclaimed: "See it just fell, everybody just ..."

146. Early made that statement knowing it was false.

147. Early knew the contraband had just been forcefully removed from Mangual's rectum and yet he created a rouse that it had simply fallen from between his buttocks.

148. Mangual continued yelling "Are you fucking serious?"

149. It was at this time that Lt. Assad entered the view of the camera and contradicted Early's false narrative.

150. Lt. Assad stated while looking at the video camera: "Baggy was removed from his buttocks down there, he resisted …"

151. Immediately after Lt. Assad finished making this statement Early said "The whole time . . . I can see it from here ..."

152. Before this incident Lt. Assad had served as an investigating officer in the Worcester Police Department Bureau of Professional Standards.

153. Randall then picked up in front of the interrogation a plastic bag to collect evidence.

154. Mangual can be heard screaming "Fuck …"

155. As Early was given a plastic baggy he gave it to Randall to handle as Mangual continued: "What the fuck did you guys do to me?"

156. Early then said to Mangual "Relax Hector, you just …"

157. Mangual told Smith "That's tough?" and Smith replied: "Enough."

158. When Mangual questioned Smith: "Enough?" Smith said "Enough of this game."

159. At 4:35 pm. Mangual told Smith "Yeah, you're not going to beat me up.  You are not going to be beat me up, ah?  Beat me up in front of the camera like that?"

160. Early interjected: "Nobody is touching you."

161. Smith interjected: "You go in there like that . . . you go in there like that your perfectly fine."

162. Mangual begged: "Can I get my clothes, please officer?"

163. Early replied: "No, you're not acting like a gentleman, we asked you, this could have been much easier."

164. Mangual continued: "Can I get my clothes?"

165. Smith exclaimed: "Unbelievable."

166. Another officer in the booking room asked somebody in the service division to "move the camera," "he's dressed."

167. At 4:36 pm. that same officer repeats "Tapes are on, were showing inside the holding area."

168. Mangual continued to complain about tight handcuffs.

169. The booking officer while talking to Randall asked Randall, "Do you want to talk to him, or let him cool down a little bit?"  Early replied, "Absolutely."

170. And the booking officer said "I'm not going to press charges."

171. Nonetheless Mangual was charged with being disorderly, with disturbing the peace and also with resisting arrest.

172. At 4:35 pm the lens of the camera was focused into the interrogation room and Smith and Hanlon appeared before the camera.

173. Mangual stated: "These handcuffs you need to loosen them brother. You fucked my shit up." i.e. that he had been beaten.

174. Smith falsely replied: "Nobody did anything to you."

175. Mangual stated: "You were punching me in the . . ."

176. Smith falsely responded: "That's fine, Ok, absolutely, whatever. . .you can say that all day long" as Early listened to the conversation between Mangual and Smith.

177. Smith, asked Mangual "You're calling me a liar?" Smith also said, the only person using vulgarity is you."

178. Mangual quipped, "right, right, right."

179. As Mangual was brought to the booking room in order to be placed in a holding tank he said: "I don't see a camera or nothing."

180. The booking officer replied: "You're on camera right now."

181. Mangual responded: "Yeah, now, but when I was in there God knows that he was doing to me."

182. The booking officer replied: "But I saw it, you were fine. Thank you for putting up with it."

183. As soon as Randall collected the contraband forcefully removed from Mangual's rectum he catalogued in an evidence collection bag.

184. The contraband was stored contained a red asterisk marking with the words written: "Body Cavity" and "5-1/2 gram bags. " Ex. 1.

185.    Another sample from the search, collected by P.O. Fred McGill, was labeled "77" with the entry: "BODY CAVITY" and next to that an arrow another word appears: "WHY." Ex. 2.

186.    The police placed the bag collected by Randall from Mangual's rectum appears at Ex. 3.

187.    Upon information and belief, the words "Body Cavity" and "Why" were entries made by a member of the Vice Squad with supervisory responsibilities.

188.    There was no legal justification for the actions of Randall, Early, Hanlon, Smith and those of Assad.

189.    At 5:55 pm, Mangual was booked at the WPD and told he had been charged with being a disorderly person, disturbing the peace, resisting arrest, possession of drugs with intent to distribute and possession of a dangerous weapon.

190.    During booking under WPD policy, the booking officer was supposed to ask Mangual a series of questions including, "Are you injured. If so, how were you injured?"

191.    The booking officer was required to ask "Were you injured, before, during, or after the arrest?"

192.    The officer who booked Mangual asked, "Are you sick right now?"

193.    Mangual replied, "No."

194.    The booking officer asked: "Injured?"

195.    Mangual replied: "I'm in pain, yes."

196.    The officer asked, "What type of pain you have, something you need emergency medical treatment for?"

197.    Mangual replied: "I don't think so, no" as he motioned to this right shoulder.

198.    The officer told Mangual "Just let us know if it gets any worse when you're back there . . ."

199.    No officer asked Mangual how he got injured or if he was injured, before, during, or after his arrest;

200.    When Mangual was stopped by police he had $110.00 dollars with him.

201.    But Randall reported finding just $90.00 on Mangual.

<u>Strip search and body cavity search policy and practice of the WPD</u>

202. The arrest and physical abuse of Mangual's was not the only occasion on which WPD detectives or officers conducted an unlawful body cavity search, unlawfully strip searched a person in a public, or unlawfully used excessive force to effectuate the search of a person.

203. The aforesaid incident was not the first time that Smith, Randall or Sgt. Early were alleged to have used excessive force.

204. At all times pertinent hereto the City and Gemme maintained a policy, practice, and usage of failing and refusing to reliably monitor and review the use of force by WPD officers.

205. At all times pertinent hereto the City and Gemme maintained a policy, practice, and usage of failing and refusing to hold officers accountable for the use of excessive force or for making false reports relating to the use of force by themselves or other officers.

206. At all times pertinent hereto, in the booking and custody of arrested persons at the WPD, the City and Gemme maintained a policy, practice, and usage of not substantively inquiring into officers' conduct when confronted at booking with physical evidence and/or credible allegations that they had assaulted or physically abused people during or after arrest.

207. At all times pertinent hereto Gemme and the City maintained a policy, practice, and usage of refusing to investigate physical abuse complaints unless the alleged victims submitted a formal written complaints and agreed to be interviewed by WPD colleagues of their alleged assailants.

208. As to written complaints of physical abuse by people willing to undergo police interviews, at all times pertinent hereto Gemme and the City maintained a policy, practice, and usage of doing show investigations that failed to meet reasonable professional standards of police administrative or criminal investigation by means of such practices as: adversarial treatment of complainants; ignoring or discounting of all but police witnesses; failing to analyze officers' accounts of the use of force  in light of objective physical evidence on the bodies of arrestees or in light of testimony of neutral witnesses; the arrangement and control of audio-video recording so as to have "dead spots" in the lockup not covered by video cameras and so as to turn video or audio recording off at will; tolerating the destruction of video likely to have captured an alleged assault in the lockup.

209. At all pertinent times each defendant knew that the use of excessive force by police violates the legal rights of their victims.

210. At all times Gemme failed to monitor and supervise the use of force including the use of force during warrantless strip searches and body cavity searches.

211.   At all pertinent times each defendant knew that the strip search of Mangual at the site of his arrest and the warrantless rectum search at the police station violated his rights to privacy and to freedom from unreasonable search and seizure.

212.   Gemme, the City of Worcester and every defendant in this case knew that on October 18, 2011, the United States First Federal Circuit Court of Appeals ruled on a case in favor of two Worcester police detectives for an alleged unlawful strip and cavity search.

213.   The case is Spencer v. Roche, et al., Case No. 11-1146 (1st Cir.  Oct. 18, 2011, Selya, CJ), the First Circuit Court of Appeals ruled that a the strip search and cavity search in question complied with the requirements of the United States Constitution and the Massachusetts Declaration of Rights.

214.   In Spencer, police learned that defendant had allegedly inserted drugs in his anal cavity.

215.   Defendant refused to cooperate with police during a visual inspection.

216.   Detectives obtained a search warrant of Spencer's anal cavity for cocaine.

217.   All defendants' knew that Spencer was taken to the hospital for this purpose.

218.   At the hospital an emergency room doctor performed a digital search of Spencer's anal cavity.

219.   The Court ruled that an x-ray of Spencer's anal cavity did not offend the state or federal constitution.

220.   Every defendant in this case not only knew of the Spencer decision but knew that they could not perform body cavity searches unless they got a warrant and got medical personnel involved.

221.   And all defendants in this case knew that they could not use excessive force in order to circumvent the warrant and medical personnel requirements.

222.   In the case of Mangual the severe physical abuse of an arrested person occurred not only at an arrest scene but in custody at the police station, in proximity to all officers in the lockup unit and the officer in charge at the police station, and with the knowledge and participation of at least two police supervisors, Lt. Assaad and Sgt. Early.

223.   At all pertinent times Randall, Sgt. Early, Hanlon, Smith, and Lt. Assad knew that they were violating WPD official policy and Mangual's rights under the law by beating and strip searching him at the arrest location and by beating and inflicting pain on him and by manually searching his rectum at the police station.

224.  Randall, Sgt. Early, Hanlon, Smith and Lt. Assad tried cooperatively to conceal their unlawful conduct by making false statements during the rectum search denying that it was taking place and denying that they were beating or inflicting pain on Mangual.

225.  At all pertinent times Randall, Sgt. Early, Hanlon, Smith and Lt. Assad were aware of the policy, practice and usage of Gemme and the City regarding officer accountability for use of excessive force or other physical abuse and for false reporting.

Other forced strip or cavity searches

226.  On May 25, 2012 John Doe was detained and forcefully stripped searched by members of the WPD.

227.  A police wagon was brought to where he was detained and without John Doe's consent, he was told he would be stripped searched.

228.  Officers told Doe there were two ways of doing a search on his body, the easy way or the hard way.

229.  When John Doe refused to cooperate his handcuffed wrists were pulled hard, his legs spread and he was punched in the head.

230.  Doe's pants and underwear were forcefully pulled down and he felt an officer with gloves put his finger up his rectum.

231.  He was arrested and when he requested medical care at the station he was denied such care.

232.  It was not until days later that police were forced to transport him to the hospital after his family complained.

Smith's, Randall and Early's abusive conduct

233.  In her amended federal complaint filed in Worcester Superior Court and later removed to the United States Federal District Court, Plaintiff Katie Warren ("Warren") alleged that Kellen Smith was one of two Worcester police officers who beat her on September 4, 2006 while at a convenience store.

234.  The complaint alleges that while Officer Smith held Warren's arms, Officer Rojas pulled Warren's head backward by her ponytail and threw her head into the glass window of the Xtramart.  Warren v. Rojas et al, CA 09-40217 at ¶ 29.

235.  Warren alleged in her that she was wrongfully arrested and maliciously prosecuted.

236. The complaint alleged that in 2009 Gemme in his capacity as Chief of Police filed Court papers to deny officer Rojas a gun permit on the basis of excessive force associated with the Warren incident.

237. Upon information and belief while Rojas was charged and subject to a disciplinary proceeding for excessive force Gemme exonerated Smith of any wrongdoing.

Ruben Melendez: Assaulted by Smith, Early and other Vice-squad officers with fists and flashlight, strip searched without warrant

238. Ruben Melendez ("Melendez") complained to Gemme and former City Manager for the City of Worcester that in 2011 he was beaten and struck in the face and head with a flashlight by vice-squad detectives during a drug raid.

239. One of the officers involved during the drug raid who beat Melendez was Kellen Smith.

240. Melendez had facial scars and stitches from being hit with a flashlight on his right cheek and on the head.

241. Melendez claimed: "The officers falsely reported that I was hiding underneath a pile of debris. One of them hit me with a black flashlight on top of my head and another time on my right cheek bone."

242. Melendez's brother alleged in a complaint given to Gemme that vice-squad detectives warned him as they were searching the apartment that "if they found drugs in the apartment they were going to beat us up again."

243. Melendez' complaint alleged: "They told my brother 'Next time we come here and see the same faces were going to shoot you.' My brother has black and blues from punches to the face."

244. Melendez alleged detectives were asking EMT's who came to the scene to check on Melendez to provide them with "band aids to put on their hands after punching me."

245. Melendez filed an additional written complaint with Gemme on April 13, 2012 alleging that during another warrantless motor vehicle search he was beaten by vice detectives.

246. Melendez claimed that while exiting his vehicle he was ". . .[w]ithout warning [he was] punched . . . repeatedly on the left side of my face around the forehead and upper jaw. I was hit with closed fist around times and then they took me out and handcuffed me . . . I was brought inside Family Dollar where they brought me to the bathroom and they strip-searched me."

247. Upon information and belief it was either Sgt. Early or detective Hanlon who punched Melendez in the face without provocation.

248. Sgt. Early and Hanlon were accompanied by Randall and another Spanish speaking officer who threatened Melendez with releasing a police canine on him.

249. Gemme cleared these officers of any wrongdoing.

Patrick Evans was punched in the face after Vice-Squad officers placed handcuffs on him on August 23, 2007

250. Patrick Evans was arrested by members of the WPD Vice-squad as a result of a drug investigation.

251. Mr. Evans ran away from police was chased and captured by a group of Vice-squad officers which included Detective Eric Boss, Lt. O'Connor and Darnell McGee.

252. When he was captured he was asked to spit out the drugs from his mouth. Mr. Evans was already handcuffed.

253. He alleged that he got punched in the face, the ribs and his stomach after being taken into custody.

254. When he got to the station and complained to the supervising vice-squad Lieutenant, he had been abused he was told by him "you did that when you were running."

Robert Hunter, Jr. was beaten by members of the Vice-Squad on November 26, 2002 following a drug arrest

255. There have been other complaints against other members of the vice-squad alleging brutality.

256. On Jan. 10, 2012 Robert Hunter, Jr., through counsel wrote a letter to Gemme that during a drug arrest on 11/26/2002 he was deliberately thrown through a glass plate and that his co-defendant was also deliberately hit in the stomach with a police baton even though he was handcuffed. Mr. Hunter heard a detective state to his co-defendant that he hit him because "Mother fucker, you made me run."

Alex Lora filed a federal lawsuit of excessive force alleging he was beaten by the WPD Vice-squad during a drug raid and stripped searched

257. Alex Lora, filed an Amended Federal Complaint in U.S. District Court alleging that on April 11, 2011 his apartment was raided for drugs by the Vice-squad. Lora v. Patrick Moran, Jon Kachadoorian, and the City of Worcester. USDCT-CA No. 4:13-cv-40131, Document 21, filed 7/24/2014.

258. Lora alleged that two vice detectives escorted him while handcuffed to the bathroom in his apartment "for the purposes of conducting a strip search." Complaint at ¶ 10.

259. Lora alleged that after one of the officers removed a handcuff from him and ordered him to put his hands on his head, when he told them "I know the routine" "Defendant Moran struck the Plaintiff without provocation with such force that the Plaintiff fell over the toilet in close quarters of the bathroom, landing on the floor." Id. at ¶ 11-12.

260. Lora alleged that "Still without any provocation, . . . Moran struck the Plaintiff several more times in the face and ribs with his fists and struck him in the stomach with his knee, all while the Plaintiff attempted to cover up to protect himself." Id. at 13.

261. Lora alleged that while detective Moran was assaulting him, detective Kachadoorian taunted him by stating: "Cry. Cry" and inquiring, "Do you want to be a smart ass?" Id. at ¶ 14.

262. Lora also alleged that "Moran then picked the Plaintiff up from the floor by pulling his hair with such force and violence that the Plaintiff's hair was ripped from his scalp, leaving a large contusion on the back of his head." Id. at ¶ 15.

263. Lora alleged that no contraband was found, he was not charged with resisting arrest, or assaulting a police officer, and there was no justifiable reason for the force used by the Defendants. Id. at ¶ 20.

264. Gemme never disciplined the officers involved.

Jerome Smith was repeatedly beaten by Smith and the Vice-Squad

265. On May 26, 2013 Jerome Smith filed a federal complaint alleging civil rights violations against a number of detective/officers within the Vice-squad and gang unit. Smith v. Detective Terrence Cahill, Sgt. Carl Supernor, and Gary Gemme, et al. US District Court Case No. 4:13-cv-40064.

266. He alleged on May 27, 2010 during the execution of a search warrant he was bludgeon in the face with a dangerous weapon, a fire-extinguisher routinely used by the Vice-squad during police raids which they brought on that day to scare and inoculate dogs that Smith owned. Complaint at ¶ 42.

267. Smith alleged in ¶ 73 that police lied regarding the circumstances of his arrest and his injuries.

268. After the beating he alleged that he was demeaned, ridiculed and called a "nigger" ". . . You are piece of shit. You are a piece of shit to nature." Id. at ¶ 53.

269. On October 24, 2012 Smith complained in writing to Gemme and City Manager O'Brien, through his counsel, regarding three beatings that he alleged happened on June 19, 2006, July 3, 2007, December 21, 2007 and May 27, 2010. Id. at ¶ 153.

270.   Smith and other witnesses alleged in affidavits that Jerome was beaten before that arrest by Detective Kellen Smith and by other officers.

271.   Specifically, Smith alleged that on June 19, 2006 he and Mr. Russell were arrested by Lt. McKiernan and by Kellen Smith. Complaint at ¶ 142.

272.   Jerome Smith alleged that detective Kellen Smith "without justification, punched [him] in the head" and that his friend Mr. Russell was knocked to the ground after being punched without justification by Lt. McKiernan." Id. at ¶ 145.

273.   Jerome Smith alleged that he and Russell were falsely charged with resisting arrest. Id. at ¶ 148.

274.   Mr. Russell (Jerome's friend) has alleged in an affidavit that later on he was the subject of a warrantless motor vehicle stop and that Lt. McKiernan told him, "Tell your friend "Short" (Smith) that when I see him I am going to shove his teeth down his throat." Complaint at at ¶ 151.

275.   Jerome Smith alleged he was beaten by Kellen Smith and Lt. McKiernan on December 21, 2007 during an arrest. He also alleged he was beaten by Kellen Smith in February 2007.

276.   Smith alleged that he was pulled out of his apartment after police broke his door and that he was beaten while in handcuffs.

277.   Jerome Smith alleged Kellen Smith punched him on the head in an apartment and that he was bleeding from his mouth and that one of his teeth was coming out of his lip.

278.   Jerome Smith alleged that he was placed in the police wagon by Kellen Smith who ordered him to strip. Jerome Smith alleged that when he told Kellen Smith "fuck you" (Smith was already handcuffed) Kellen Smith "hit me a number of times with a closed fist in the head and then I complied."

The brutal beating and false arrest of Ricardo Ramirez by two Vice-Squad Detectives in July 2011

279.   On April 24, 2014, Ricardo Ramirez filed a federal civil rights complaint against the City, Gemme, and two vice-detectives, Dana Randall and Larry Williams. Ramirez v. The City of Worcester, et al, CA No. 4:14-cv-40054, Doc. 1.

280.   Ramirez alleged that he was brutally beaten by detectives Randall and Williams and falsely charged with drug violations and with resisting arrest.

281.   Ramirez alleged that he was punched in the by both detectives and that as a direct result he was diagnosed with three facial fractures, on the right mandible, the left mandible and in the upper left jaw that required surgical repair. He also had broken teeth.

282. Ramirez alleged in his complaint that "Randall falsely and maliciously reported that as he and Williams took Ramirez to the ground, Ramirez lost control of his footing and fell to the ground where he continued to fight violently hitting his mouth on the sidewalk."

283. Ramirez alleged that Randall filed a false report, used excessive force and maliciously prosecuted him.

284. Ramirez alleged in his complaint that he incurred medical and dental expenses in the amount of $35,170.43 at that no one was disciplined.

285. Ramirez alleged in his complaint that the City and Gemme failed to establish reasonable investigatory, training and disciplinary mechanisms to insure that booking officers complied with the Massachusetts Injured Prisoner Statute M.G.L. c. 276 § 33.

286. Gemme has not disciplined any of these detectives.


Anthony Hayes: Facial fractures sustained without resisting arrest

287. Anthony Hayes filed a lawsuit in federal district court against a number of vice-squad detectives arising when police executed a search warrant. *Hayes v. McGee, et al.*, US. District Court, Docket No. 10-40095.

288. He alleged in his complaint that on March 2, 2007 he sustained an orbital fracture due to being struck in the face with a hard object.

289. When he was booked in the police department and had visible signs of injuries he was asked what happened to him and Hayes replied "I just got hit in the face with a flashlight."

290. He alleged in the complaint that though clearly injured when he presented for booking at the policed station, the arresting officer's report portrayed the arrest as uneventful and gave no hint at all as to how Hayes got hurt.

291. Per his complaint Hayes was taken from the WPD station to the hospital where he told doctors: "The police kicked my door in and beat my face."

292. Hayes was diagnosed with multiple facial fractures, including displaced fractures of the anterior wall of the right maxillary sinus and a probable fracture at the posterior wall of the right maxillary sinus. Plastic surgery was required to reassemble fractured and fragmented bones in Hayes' face and to restore crushed sinuses.

293. Although Hayes complained to Gemme and provided medical records verifying injuries that were grossly inconsistent with the official account of the arrest, Chief Gemme wrote Hayes that "your complaint is not sustained, i.e. there is not sufficient evidence to either prove or disprove the allegation." See, Amended complaint at ¶ 250.

### The 2011 custodial beating of John Hickson

294. On May 19, 2014 John Hickson brought a federal civil rights complaint alleging he was beaten when arrested and abused at the police station and at a medical facility during May 21, 2011.  Hickson v. The City of Worcester, et al, USDCT, CA, No. 4:14-cv-40069, Doc. 1.

295. He alleged that when arrested, he was thrown by police in the air from a porch and the landed on the sidewalk. He also alleged that at the WPD he was swung in the air and thrown head first into the cell while handcuffed.

296. Hickson alleged that as a result he was transported by police to a hospital and required seven staples to suture his head wound resulting from being intentionally thrown while he was shackled and handcuffed.

297. He also alleged no police officer was disciplined as a result of his beating.

### Other lawsuits have alleged that citizens have suffered serious injuries without any disciplinary consequences

298. Charles Evangelista alleged in a federal suit that, while he was in custody of the WPD on March 16, 2003, he was beaten, kicked and stomped, causing his bladder to rupture and that he required surgery. *Evangelista v. Marcotte et al.,* U.S. District Court, District of Massachusetts, Docket No. 05-CV-10311-ML.

299. Evangelista also alleged in his federal complaint that the City destroyed a surveillance tape that would have depicted the beating.

300. Gemme has publicly claimed the tape, had been mistakenly "rewound" and erased.

301. The City paid $250,000 to settle Evangelista's claim.

302. Gemme and the City claimed Evangelista's claims were investigated but that no wrongdoing was found.

303. Any investigation done was woefully deficient and evinced deliberate indifference to the rights of citizens coming into contact with the WPD.

304. Gemme exonerated the officers involved in the Evangelista incident, stating to the press, "I have absolute faith in the officers and supervisors who were on scene that day."

305. Gemme explained the settlement as a business decision, stating to the press: "When you buy into risk assessment you have to say you are willing to absorb some costs."

Daniel Houde was savagely beaten resulting in 9 bilateral facial fractures, the City paid him $100K: no one is disciplined

306. Daniel Houde alleged in a federal complaint that on May 20, 2002, due to a WPD beating with shod foot and flashlights he sustained nine bilateral facial fractures. *Houde v. Turgeon, et al.*, US. District Court, District of Massachusetts, 05-40075-FDS. See e.g., Complaint at ¶ 57.

307. In Houde's case his multiple facial injuries and fractures and other serious visible injuries were explained in the police report in vague and ambiguous terms, "during the altercation Houde suffered a laceration above his right eye."

308. In federal court, the officers filed motions to be excused from responsibility on qualified immunity grounds.

309. But a Federal Judge denied their motion stating in his ruling: "What began as a traffic stop for a minor violation rapidly escalated into a physical altercation, in which Houde was severely beaten and sustained substantial physical injuries. Viewed from the standpoint of an objectively reasonable officer, Houde's resistance to defendants' efforts to handcuff him may not have warranted such an extreme response. A reasonable officer may not have believed that defendants' conduct was appropriate." Memorandum and Order, September 30, 2007, F. Dennis Saylor IV, United States District Judge.

310. Despite Houde's beating, and the City's countenance and denial of it, the City agreed to pay Houde $100,000 to settle his claims.

311. Although the incident resulted in a substantial payment by the City, Gemme saw no need for a WPD investigation, as he explained to a newspaper reporter, because Houde "did not file a complaint with the police department."

312. Houde's case exemplifies how the Code of Silence operated from the lowest to the highest levels of the WPD.

Richard N. Tousignant, Brandon S. Blair, Randy Boucher and Leon A. King were all beaten by police a jury returned a substantial verdict against the officers and settled the case of Blair and Tousignant for $486K, but no one was disciplined by Chief Gemme

313. Richard N. Tousignant and Brandon S. Blair proved in June of 2010, according to a jury verdict, that WPD officers had falsely arrested them and had used excessive force during an incident that occurred in December, 2001.

314. No investigation was ever undertaken by the City in connection with this case.

315.  In June 29, 2010 a federal jury found the defendants liable for $150,000 in compensatory and punitive damages. *Blair and Tousignant v. Towler et al.*, U.S. District Court District of Massachusetts, CA No. 06-40129 FDS. The City ultimately paid the plaintiff's the sum of $486,000.00 to settle all cases against them. See, e.g., Document 61-3 Filed 1/28/2013.

316.  Gemme did not discipline any of the officers involved in that case.

317.  There are at least five additional pending lawsuit that allege serious physical injuries without any substantive investigation or disciplinary consequences.

<u>COUNT I</u>
Massachusetts Civil Rights Act, M.G.L. c. 12 § 111, Massachusetts Declaration of Rights
All Defendants

318.  Each of the foregoing paragraphs is incorporated as if fully set forth herein.

319.  Defendants  Sgt. Early, Hanlon, Smith, Randall and Doe used threats, intimidation and coercion against the plaintiff  in order to make him submit to a strip search and anal cavity search without consent, in violation of his well-established rights, including the right to freedom from unreasonable search and seizure under the Fourth Amendment to the U.S. Constitution, as applied under the Fourteenth Amendment, and under the Constitution and laws of Massachusetts, and the right to privacy under the Constitution and laws of Massachusetts.

320.  These defendants, by the aforesaid conduct, violated the Massachusetts Civil Rights Act, M.G.L. c. 12 § 111, and as a direct and proximate result they injured the plaintiff and caused him great pain of body and mind.

321.  At all pertinent times the City, by its policymakers, and Gemme knew that by maintaining and observing the policies, practices and usages of the WPD as set forth herein they would likely cause some officers of the WPD to engage in the use excessive force, unlawful strip search, and/or unlawful body cavity search against arrested persons in drug cases.

322.  By continuing and maintaining the policies, practices and usages of the WPD the City and Gemme knowingly and intentionally caused the violation of Mangual's rights under the Massachusetts Civil Rights Act, M.G.L. c. 12 § 111, and as a direct and proximate result they injured the plaintiff and caused him great pain of body and mind.

## COUNT II
### Massachusetts Privacy Act, M.G.L. c. 214 § 1B
### Defendants' Sgt. Early, Hanlon, Smith, Randall and Lt. Assad

323.    Each of the foregoing paragraphs is incorporated as if fully set forth herein.

324.    Defendants  Sgt. Early, Hanlon, Smith, Randall and Lt. Assad  subjected Plaintiff to an illegal strip search and an illegal body cavity search accomplished by means of excessive force and without consent or justification.

325.    Defendants violated the plaintiff's privacy rights under the Massachusetts Privacy Act, M.G.L. ch. 214 § 1B, by unreasonably, substantially, and seriously interfering with his privacy.

326.    As a direct and proximate result they injured the plaintiff and caused him great pain of body and mind.

327.    By continuing and maintaining the policies, practices and usages of the Defendants' knowingly and intentionally caused the violation of Mangual's rights under the Massachusetts Privacy Act, M.G.L. ch. 214 § 1B and as a direct and proximate result they injured the plaintiff and caused him great pain of body and mind.

## COUNT III
### Malicious Prosecution
### Sgt. Early, Hanlon, Smith, Randall

328.    Each of the foregoing paragraphs is incorporated as if fully set forth herein.

329.    Sgt. Early, Hanlon, Smith, and Randall, by their actions as set forth herein did engage in the malicious prosecution of Mangual for disorderly conduct, disturbing the peace, and resisting arrest, resulting in his incarceration and great pain of body and mind.

## COUNT IV
### Conspiracy
### Sgt. Early, Hanlon, Smith, Randall and Lt. Assad

330.    Each of the foregoing paragraphs is incorporated as if fully set forth herein.

331.    These Defendants did conspire to conceal the unlawful strip search and body cavity search of Mangual as set forth herein, and thereby violated his statutory, common law and constitutional rights.

COUNT VI

Assault & Battery/Sexual Assault & Battery

Hanlon, Smith

332.    Each of the foregoing paragraphs is incorporated as if fully set forth herein.

333.    These Defendants' committed the common law torts of assault and battery and/or sexual assault and battery against the plaintiff.

334.    As a direct and proximate result thereof, the plaintiff's suffered harm and great pain of body and mind.

COUNT VIII

Intentional Infliction of Emotional Distress

Sgt. Early, Hanlon, Smith, Randall and Lt. Assad

335.    Plaintiff incorporates the above paragraphs by reference into this count as if fully set forth herein.

336.    The conduct of these Defendants constituted intentional infliction of emotional distress.

337.    By their vile and indecent actions, these defendants subjected Plaintiff  to reprehensible conduct knowingly, intentionally, willfully, purposely, maliciously and with reckless disregard for the rights and well being of the plaintiff.

338.    As a direct result of the intentional conduct of the defendants in this count, Plaintiff suffered severe emotional distress and great pain of body and mind.

PRAYER FOR RELIEF

The Plaintiff respectfully requests the Court to order the following relief:

1.      All compensatory damages recoverable;
2.      All punitive damages recoverable;
3.      All attorney's fees, costs and expenses allowable;
4.      That defendants be found jointly and severally liable;
5.      Any and all other relief as the Court deems just and proper.

PLAINTIFF DEMANDS A JURY TRIAL AS TO ALL COUNTS IN THE COMPLAINT

Respectfully submitted,
Hector Mangual, Plaintiff
By his attorneys,

_____
Hector E. Pineiro, BBO # 555315
Robert A. Scott BBO # 648740
Law Office of Hector E. Pineiro, LLC
807 Main Street
Worcester, MA 01610
Tel. (508) 770-0600
Fax (508) 770-1300
hector@pineirolegal.com
robin@pineirolegal.com

DATED:  October 23, 2014

# EXHIBIT 1



# EXHIBIT 2

(Mr Fred McGill )

F. McGill

Hector
MANCINE

10-24-11

Hector MAC

W11-02696

# EXHIBIT 3

