UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

HECTOR L. MANGUAL,  )
    Plaintiff  )
  )
v.  )
  )
  )
THE CITY OF WORCESTER, a municipal  )
Corporation, DETECTIVE SGT MATTHEW  )
EARLY, DET. MICHAEL HANLON,  and  )
DETECTIVE KELLEN SMITH,  )
  )
    Defendants  )

## AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

### PARTIES

1. Plaintiff Hector Mangual ("Mangual") resides in the Concord, Middlesex County, Massachusetts.

2. Defendant City of Worcester ("the City") is a municipal corporation duly organized and chartered under the laws of the Commonwealth of Massachusetts, with its place of business at 455 Main Street, City of Worcester, Worcester County, Massachusetts.

3. Defendant Detective Sgt. Matthew Early ("Sgt. Early") was at all pertinent times a duly sworn officer and detective of the WPD in its vice squad.

4. Defendant Detective Michael Hanlon ("Hanlon") was at all pertinent times a duly sworn officer and detective of the WPD in its vice squad and an attorney at law.

5. Defendant Detective Kellen Smith ("Smith") was at all pertinent times a duly sworn officer and detective of the WPD in its vice squad.

6. Each individual defendant is sued in his individual and official capacities.

### FACTS

7. Each of the foregoing paragraphs is incorporated as if fully set forth herein.

8. At all relevant times the City was the employer of each individual defendant.

9. At all times pertinent hereto the each individual defendant acted under color of law in his capacity as a police officer and/or policy maker of the City and pursuant to the statutes,

1

ordinances, regulations, policies, customs, practices, and usage of the Commonwealth of Massachusetts and/or the City of Worcester.

10. On October 24, 2011 at 4:51 pm, Mangual was unlawfully stopped and searched without a warrant while walking at the intersection of Sycamore and Main Street, Worcester, by a group of plainclothes detectives that included Sgt. Early, Detectives Smith, Hanlon, Carlson, and Williams and who were subsequently joined by Detective Dana Randall.

11. Mangual asked the detectives why they were restraining and frisking him and they falsely told him that he fit the description of an armed robber.

12. Mangual's wrists were cuffed behind his back, and Sgt. Early with Smith and Hanlon took him to a private driveway at a used car dealership and placed him between cars parked in there.

13. At no time did Mangual consent to any strip search or body cavity search by the officers.

14. The detectives pulled Mangual's pants down, yanked up hard on his underwear and began searching and looking at his genitals and his buttocks.

15. Hanlon pressed with his fingers on Mangual's butt cheeks.

16. Smith punched Mangual in the rib cage area three or four times and kneed him in the leg in the presence of Early and Hanlon.

17. Mangual screamed in pain, "Why are you hitting me?" and he called out to passersby "Help me, they're hitting me."

18. Smith told Mangual, "You fucking punk, I'm going to knock your teeth off if you don't shut up."

19. Police also forced Mangual to squat and put his foot on the bumper of a vehicle to facilitate the search, but they found no contraband.

20. Randall, who was not present during the foregoing searching and beating of Mangual, wrote in his report that the officers merely did a "pat frisk" of Mangual as he yelled "don't fucking sexually abuse me."

21. When their first search and beating of Mangual produced no contraband Sgt. Early, Hanlon and Smith forced him toward a trailer that served as the office of the dealership, stating that they would search him in the trailer, as Mangual continued his protests.

22. In his report Sgt. Early described this location as a place of business restroom at Main and Sycamore Street.

23. As the detectives brought Mangual to the trailer Smith they attempted to slam Mangual's head against a wooden beam but Mangual was able to move so that his shoulder struck the beam instead.

24. Detectives removed his clothing with gloved hands and began to spread his butt cheeks.

25. A number of individuals walking about at the corner of Sycamore and Main Street began yelling at the officers, "Hey that's not legal." "Hey, why are you hurting him?"

26. Police repeatedly told such persons to move on or they would face arrest.

27. Sgt. Early, Hanlon and Smith decided to take Mangual in between two dumpsters in the area to try searching him again, still in plain view of pedestrians on Main Street.

28. He was told to "make it easy" because they were going to strip him, and Mangual heard that a police wagon was on the way.

29. Mangual heard Sgt. Early speaking on a two-way radio with an individual who on information and belief was Randall, who asked: "What you got?" to which Early replied, "Nothing, he's cleared."

30. At this time Mangual spotted Randall standing at the corner of Main Street approximately 90 feet away.

31. The searches of Mangual produced no drugs, just a fake gun and a small steak knife that Smith confiscated without incident.

32. When Randall finally came over to speak with Early, Mangual and others. After Mangual had been searched three times, Randall told Mangual,"Listen, give me the fucking stuff and I'll make sure you get $40.00 bail."

33. The police dispatch demonstrates that a Vice squad officer (# 160) requested a wagon to Main and Sycamore Street for a vice squad arrest.

34. But instead of being transported in a police patrol wagon as per WPD regulations, Mangual was transported by Sgt. Early, Randall and Smith in a small SUV vehicle.

35. When Mangual asked why he was not transported in a police wagon Sgt. Early told him: "Oh, no, were bringing you to the station and were stripping you."

36. At the Worcester police station when officers brought Mangual into the sally port next to the booking area, he heard Sgt. Early say "Shut the camera off."

37. Mangual was brought into an interrogation room next to the booking desk in the WPD service division.

38. None of the initial conversations and interactions between Mangual and police were recorded despite the technical ability to do so.

39. At all times material to this complaint the WPD Policy 720, a six-page document effective as of January 3, 2008, regulated strip searches.

40. The policy provided that "normally strip search at the scene of an arrest is not necessary."

41. Policy 720 states a strip search refers "to the removal or rearrangement of a subject's clothing in order to permit inspection of his or her private areas, genital, pubic area, buttocks and female breast, without any scrutiny of his or her body cavities."

42. Policy 720 also distinguished between a "Visual body cavity search" and a "Manual body cavity search."

43. A visual body cavity search encompassed a visual inspection of the anal and genital areas with those areas being opened and manipulated by the individual being searched.

44. Policy 720 described a manual body cavity search as the "most intrusive, involves some degree of touching and probing of body cavities."

45. Policy 720 stated: "It is not considered a manual body cavity search (necessitating a warrant) if the police are able to persuade the subject to remove the item."

46. The policy further provided: "It is also not a manual probe if police are able to remove the secreted object without touching the body cavity (e.g. a visible package of cocaine protruding from the subject's "butt cheeks" that officers can snatch without manipulating that anal region)."

47. Policy 720 provided in unmistakable language that: "Manual body cavity searches shall only be conducted by medical staff at a local hospital and upon approval by the officers' supervisor."

48. Policy 720 provided the following language: "Authority: A manual body cavity search may only be conducted pursuant to a search warrant, issued by a judge, based on a strong showing of particularized need supported by a high degree of probable cause." *Rodrigues v. Furtado,* 410 Mass. 878 (1991).

49. Each police officer and police supervisor who came in contact with Mangual on October 24, 2011, knew that a warrant was required for a manual body cavity search.

50. The Policy required a police supervisor to make the determination whether or not a strip search and/or body cavity search should be conducted. P. 2

51. Policy 720 required that a "Supervisor will ensure that every provision of this policy is complied with in those cases where a strip search, visual body cavity search and/or a manual body cavity search is to be performed." P. 2.

52. WPD supervisors were responsible to review and forward the report of a strip of body cavity search through the proper channels to the Chief's office within 24 hours of the search. P. 2.

53. Policy 720 allowed strip searches but provided that they be done in a private room, or in a police wagon, when an officer had probable cause to believe that the subject might be armed.

54. The policy required that strip searches and visual body cavity searches be conducted in a non-humiliating, professional manner, and only for legitimate law enforcement or public safety objectives.

55. The policy provided that no strip searches and/or visual body cavity searches be conducted on camera or in the presence of non-police personnel.

56. The policy provided that the WPD Service Division supervisor be present for strip searches.

57. Lt. Assad was the "official in charge" at WPD service division at the time officers performed a body cavity search on Mangual.

58. The policy required that, "video monitoring tape shall be turned on prior to the performance of the strip search and/or visual body cavity searches, and the supervisor will then relay what actions are being taken so that they may be recorded via audio portion of the camera monitoring system. It is imperative that at all times that the prisoner remain outside of the video camera range." P. 4

59. As to manual body cavity searches the police required that "[o]nly a qualified medical professional, pursuant to a warrant may conduct an intrusion of a body cavity, or extract any items from a body cavity. After the warrant is issued, the arrested person shall be transported to a medical facility so that a qualified medical professional may extract any items from the body cavity."

60. On October 24, 2011, Mangual was brought to an interrogation/holding room at the service division at 4:27 pm.

61. An audio video recording from the area just outside the interrogation room captured no images of Mangual during the search but his voice is clearly audible, and Early, Smith and Hanlon can be heard and are seen much of the time.

62. Mangual, fearing that the beatings he got on the street would resume, insisted, "I want to stay in front of the camera. . ."

63. Sgt. Early told Mangual "We're not allowed."

64. Smith is seen on the video tape wearing dark leather gloves and Hanlon and Early are seen wearing latex-type surgical gloves.

65. Shortly after Mangual was brought handcuffed into the interrogation room, Mangual yelled "What the fuck man, ahh" and calling the detectives "Fucking freak."

66. Mangual screamed "fucking assholes" as Early told him "Hector, stop resisting, stop it."

67. Mangual yelled "Put the fucking camera on" and "You guys are fucking abusing me."

68. At 4:28 pm. Early can be heard saying: "Let us start the search . . .Spread your legs Hector."

69. Mangual again asked to be put on camera and for officers to "cover my face."

70. At 4:28 pm. Sgt. Early suggested to Mangual, "If you just do what you're asked . . . It's just simple, like Simon says . . ."

71. The WPD use of force policy forbids the use of excessive force and forbids any type of abusive conduct towards an arrestee.

72. At 4:28 pm, Mangual screamed "The fucking guy is on my back, I can't fucking breath man."

73. As Smith and Hanlon continued to force themselves on Mangual, Mangual reiterated, "I can't breath, the handcuff is cutting my wrist."

74. Sgt. Early told Mangual, "This is the first you complain about your wrists."

75. After additional force was applied Mangual yelled: "You mother fucking . . . There is no reason for you guys to be fucking hurting me . . . bro."

76. Early stated, "Were not hurting you, calm down and relax." Early made this statement knowing it was false.

77. The video shows officer Hanlon against the wall in a seated position, as Early instructs Mangual to "remain calm and spread your legs."

78. Mangual continued: "All right bro, you're hurting me" at 4:29 pm.

79. When Early told Mangual "Your hurting yourself by resisting, stop tensing and relax" Mangual said "What the fuck man."

80. At 4:30 pm either Hanlon or Smith told Mangual "Hector we asked you out in the street to do this and you resisted."

81. The next audible commentary involves Early narrating: "Were trying to take your pants off."

82. Immediately after, Mangual screamed "You people are fucking crazy I swear to God, you people are fucking nuts"

83. Early next instructed Mangual to turn and face the wall. Early said, "Just do what you're told."

84. Mangual replied "I got a choice but you're stepping on me kicking me."

85. Early falsely responded in order to cover up for Smith and Hanlon's conduct by stating "No one's kicking you." Early made that statement knowingly.

86. After Early asserted that no one was kicking Mangual, Mangual immediately responded "Bro' you slammed me on my face man, swear man, in my fucking face, you slammed me… There's no camera's here bro, no fucking camera ahh."

87. Mangual next said, "You guys lie, specially lie, the whole side of my face . . . Lie the hole fucking time."

88. At this time Mangual's pants and underwear had been completely removed.

89. At 4:31 pm as Sgt. Early can be heard narrating, "Were' searching his pants now."

90. At or about this time Kellen Smith is visible and wearing a red jacket, as Mangual said "Look my hands are turning blue ..."

91. Mangual also said, "Look at my wrist officer… Look at the wrist man."

92. At 4:31 pm Mangual insisted: "Look at my wrist man" and demanded "I want to see a doctor."

93. Early facetiously questioned Mangual "Why do you want to see a doctor?"

94. Mangual retorted "You keep slamming me on my face officer."

95. Early replied "Nobody did that."

96. At 4:32 pm. Smith told Mangual "And all this is a game…It's all a game, go with the program yelling screaming … Yelling and screaming that people are hurting you and they're not."

97. Immediately, Mangual replied: "And you banged me brother."

98. By "banged" Mangual was verbalizing that he had been punched.

99. As the officers used more force to make Mangual comply, Mangual said, "No man, common man with that shit, what are you doing?"

100. At 4:32 pm., Early told Mangual "Spread your cheeks, you've been searched before you know the procedure."

101. Mangual replied "This is fucking embarrassing, Common man."

102. At the same time when Early told Mangual "Hector stop." In turn, Mangual replied "Why are you twisting my wrist."

103. Smith was purposely using pressure points to inflict pain on Mangual.

104. At 4:33 pm Mangual began to yell, moan and cry, "My fucking wrist, Ah my wrist."

105. Even though Early knew Mangual was being abused and that it was impossible for him while handcuffed to spread his butt cheeks, he told Mangual: "Your very good at it Hector."

106. Hanlon was trying to open with his hands Mangual's butt cheeks.

107. At 4:33 pm, Early bent his body toward the cell and questioned as Hanlon hands were in Mangual's anal area, "You got it?"

108. At 4:33 pm, Early reiterated: "When you see a baggy protruding from his butt …tell me" as Mangual continued to scream in agony "Ah, my wrist."

109. No baggy was visible or protruding.

110. Seconds later, Early told Mangual, "Hector is there, the games up, you're going to jail."

111. Hanlon forcefully spread Mangual's butt cheeks and inserted his fingers into Mangual's rectum while Smith twisted Mangual's writs and he screamed: "Ah, my wrist."

112. At 4:33:32 pm, Early continued to insist that Mangual stop fighting as he looked away from inside the interrogation room.

113. Either Smith and/or Hanlon told Mangual, "Spread your cheeks Hector," knowing that with handcuffs it was impossible for him to do so.

114. Mangual continued to scream in agony, "Ah my wrist."

8

115. It was only then, that Hanlon and/or Smith said "It's protruding out there, protruding."

116. Early immediately replied: "Yeah, I know, I said that, I can see it from here," as he leaned into the room to get a better view of something he had thus far been unable to see.

117. Early continued: "Spread your cheeks" as Mangual continued to wail in agony "Ah, my wrists."

118. At 4:33 pm, Early stated, "Hector, games up, I can see it from here."

119. It was at that time that contraband was manually removed from Mangual's rectum by Hanlon as Hanlon said "Got it."

120. At 4:34 pm, Mangual continued to scream, "Are you serious man?"... "Stop fucking violating me…" "What are you fucking doing man?"… "Why are you [Early] letting them do this to me man?"

121. As Mangual continued to complain Early told Mangual "No one has touched you relax…" "Stop resisting."

122. When Early told Mangual "No one has touched you," he made it knowing that it was false.

123. Mangual immediately replied "Now he hit me."

124. Early responded: "Stop resisting, no one's hitting you."

125. At this time Lt. Assad peeked through the interrogation room as Mangual proclaimed "Common man, your fucking serious!"

126. At approximately 4:34 pm. Mangual began wailing and screaming: "Ah, your banging my ass," . . . "What the fuck are you doing?"… "You're fucking violating me."

127. It was at this time that Early falsely proclaimed: "See it just fell, everybody just …"

128. Early made that statement knowing it was false.

129. Early knew the contraband had just been forcefully removed from Mangual's rectum and yet he created a rouse that it had simply fallen from between his buttocks.

130. Mangual continued yelling "Are you fucking serious?"

131. It was at this time that Lt. Assad entered the view of the camera and contradicted Early's false narrative.

132. Lt. Assad stated while looking at the video camera: "Baggy was removed from his buttocks down there, he resisted …"

133. Immediately after Lt. Assad finished making this statement Early said "The whole time . . . I can see it from here ..."

134. Before this incident Lt. Assad had served as an investigating officer in the Worcester Police Department Bureau of Professional Standards.

135. Randall then picked up in front of the interrogation a plastic bag to collect evidence.

136. Mangual can be heard screaming "Fuck …"

137. As Early was given a plastic baggy he gave it to Randall to handle as Mangual continued: "What the fuck did you guys do to me?"

138. Early then said to Mangual "Relax Hector, you just …"

139. Mangual told Smith "That's tough?" and Smith replied: "Enough."

140. When Mangual questioned Smith: "Enough?" Smith said "Enough of this game."

141. At 4:35 pm. Mangual told Smith "Yeah, you're not going to beat me up. You are not going to be beat me up, ah? Beat me up in front of the camera like that?"

142. Early interjected: "Nobody is touching you."

143. Smith interjected: "You go in there like that . . . you go in there like that your perfectly fine."

144. Mangual begged: "Can I get my clothes, please officer?"

145. Early replied: "No, you're not acting like a gentleman, we asked you, this could have been much easier."

146. Mangual continued: "Can I get my clothes?"

147. Smith exclaimed: "Unbelievable."

148. Another officer in the booking room asked somebody in the service division to "move the camera," "he's dressed."

149. At 4:36 pm. that same officer repeats "Tapes are on, were showing inside the holding area."

150. Mangual continued to complain about tight handcuffs.

151. The booking officer while talking to Randall asked Randall, "Do you want to talk to him, or let him cool down a little bit?" Early replied, "Absolutely."

152. And the booking officer said "I'm not going to press charges."

153. Nonetheless Mangual was charged with being disorderly, with disturbing the peace and also with resisting arrest.

154. At 4:35 pm the lens of the camera was focused into the interrogation room and Smith and Hanlon appeared before the camera.

155. Mangual stated: "These handcuffs you need to loosen them brother. You fucked my shit up." i.e. that he had been beaten.

156. Smith falsely replied: "Nobody did anything to you."

157. Mangual stated: "You were punching me in the . . ."

158. Smith falsely responded: "That's fine, Ok, absolutely, whatever. . .you can say that all day long" as Early listened to the conversation between Mangual and Smith.

159. Smith, asked Mangual "You're calling me a liar?" Smith also said, the only person using vulgarity is you."

160. Mangual quipped, "right, right, right."

161. As Mangual was brought to the booking room in order to be placed in a holding tank he said: "I don't see a camera or nothing."

162. The booking officer replied: "You're on camera right now."

163. Mangual responded: "Yeah, now, but when I was in there God knows that he was doing to me."

164. The booking officer replied: "But I saw it, you were fine. Thank you for putting up with it."

165. As soon as Randall collected the contraband forcefully removed from Mangual's rectum he catalogued in an evidence collection bag.

166. The contraband was stored contained a red asterisk marking with the words written: "Body Cavity" and "5-1/2 gram bags. "

167. Another sample from the search, collected by P.O. Fred McGill, was labeled "77" with the entry: "BODY CAVITY"

168. The police placed the bag collected by Randall from Mangual's rectum appears at Ex. 3.

169. Upon information and belief, the words "Body Cavity" were entries made by a member of the Vice Squad with supervisory responsibilities.

170. There was no legal justification for the actions of Randall, Early, Hanlon, Smith and those of Assad.

171. At 5:55 pm, Mangual was booked at the WPD and told he had been charged with being a disorderly person, disturbing the peace, resisting arrest, possession of drugs with intent to distribute and possession of a dangerous weapon.

172. During booking under WPD policy, the booking officer was supposed to ask Mangual a series of questions including, "Are you injured. If so, how were you injured?"

173. The booking officer was required to ask "Were you injured, before, during, or after the arrest?"

174. The officer who booked Mangual asked, "Are you sick right now?"

175. Mangual replied, "No."

176. The booking officer asked: "Injured?"

177. Mangual replied: "I'm in pain, yes."

178. The officer asked, "What type of pain you have, something you need emergency medical treatment for?"

179. Mangual replied: "I don't think so, no" as he motioned to this right shoulder.

180. The officer told Mangual "Just let us know if it gets any worse when you're back there . . ."

181. No officer asked Mangual how he got injured or if he was injured, before, during, or after his arrest;

182. The arrest and physical abuse of Mangual's was not the only occasion on which WPD detectives or officers conducted an unlawful body cavity search, unlawfully strip searched a person in a public, or unlawfully used excessive force to effectuate the search of a person.

183. The aforesaid incident was not the first time that Smith or Sgt. Early were alleged to have used excessive force.

184. At all times pertinent hereto the City maintained a policy, practice, and usage of failing and refusing to reliably monitor and review the use of force by WPD officers.

185. At all times pertinent hereto the City maintained a policy, practice, and usage of failing and refusing to hold officers accountable for the use of excessive force or for making false reports relating to the use of force by themselves or other officers.

186. At all times pertinent hereto, in the booking and custody of arrested persons at the WPD, the City maintained a policy, practice, and usage of not substantively inquiring into officers' conduct when confronted at booking with physical evidence and/or credible allegations that they had assaulted or physically abused people during or after arrest.

187. At all times pertinent hereto the City maintained a policy, practice, and usage of refusing to investigate physical abuse complaints unless the alleged victims submitted a formal written complaints and agreed to be interviewed by WPD colleagues of their alleged assailants.

188. As to written complaints of physical abuse by people willing to undergo police interviews, at all times pertinent hereto the City maintained a policy, practice, and usage of doing show investigations that failed to meet reasonable professional standards of police administrative or criminal investigation by means of such practices as: adversarial treatment of complainants; ignoring or discounting of all but police witnesses; failing to analyze officers' accounts of the use of force in light of objective physical evidence on the bodies of arrestees or in light of testimony of neutral witnesses; the arrangement and control of audio-video recording so as to have "dead spots" in the lockup not covered by video cameras and so as to turn video or audio recording off at will; tolerating the destruction of video likely to have captured an alleged assault in the lockup.

189. At all pertinent times each defendant knew that the use of excessive force by police violates the legal rights of their victims.

190. At all times the City failed to monitor and supervise the use of force including the use of force during warrantless strip searches and body cavity searches.

191. At all pertinent times each defendant knew that the strip search of Mangual at the site of his arrest and the warrantless rectum search at the police station violated his rights to privacy and to freedom from unreasonable search and seizure.

192. And all defendants in this case knew that they could not use excessive force in order to circumvent the warrant and medical personnel requirements.

193. In the case of Mangual the severe physical abuse of an arrested person occurred not only at an arrest scene but in custody at the police station, in proximity to all officers in the lockup unit and the officer in charge at the police station, and with the knowledge and participation of a police supervisor, Sgt. Early.

194. At all pertinent times Sgt. Early, Hanlon and Smith, knew that they were violating WPD official policy and Mangual's rights under the law by beating and strip searching him at the arrest location and by beating and inflicting pain on him and by manually searching his rectum at the police station.

195. Sgt. Early, Hanlon and Smith tried cooperatively to conceal their unlawful conduct by making false statements during the rectum search denying that it was taking place and denying that they were beating or inflicting pain on Mangual.

196. At all pertinent times Sgt. Early, Hanlon, and Smith were aware of the policy, practice and usage of the City regarding officer accountability for use of excessive force or other physical abuse and for false reporting.

## COUNT I
**Massachusetts Civil Rights Act, M.G.L. c. 12 § 11H to 11J,**
**Massachusetts Declaration of Rights**
   **Sgt. Early, Hanlon and Smith**

198   Each of the foregoing paragraphs is incorporated as if fully set forth herein.

199.   Defendants Sgt. Early, Hanlon, and Smith used threats, intimidation and coercion against the plaintiff in order to make him submit to a strip search and anal cavity search without consent, in violation of his well-established rights, including the right to freedom from unreasonable search and seizure under the Fourth Amendment to the U.S. Constitution, as applied under the Fourteenth Amendment, and under the Constitution and laws of Massachusetts, and the right to privacy under the Constitution and laws of Massachusetts.

200.   These defendants, by the aforesaid conduct, violated the Massachusetts Civil Rights Act, M.G.L. c. 12 §11H to 11J, and as a direct and proximate result they injured the plaintiff and caused him great pain of body and mind,

## COUNT II
**Massachusetts Privacy Act, M.G.L. c. 214 § 1B**
**Defendants' Sgt. Early, Hanlon, and Smith**

201. Each of the foregoing paragraphs is incorporated as if fully set forth herein.

202. Defendants Sgt. Early, Hanlon, and Smith subjected Plaintiff to an illegal strip search and an illegal body cavity search accomplished by means of excessive force and without consent or justification.

203. Defendants violated the plaintiff's privacy rights under the Massachusetts Privacy Act, M.G.L. ch. 214 § 1B, by unreasonably, substantially, and seriously interfering with his privacy.

204. As a direct and proximate result they injured the plaintiff and caused him great pain of body and mind.

205. By continuing and maintaining the policies, practices and usages of the Defendants' knowingly and intentionally caused the violation of Mangual's rights under the Massachusetts Privacy Act, M.G.L. ch. 214 § 1B and as a direct and proximate result they injured the plaintiff and caused him great pain of body and mind.

**COUNT III**
**Conspiracy**
**Sgt. Early, Hanlon, and Smith**

206. Each of the foregoing paragraphs is incorporated as if fully set forth herein.

207. These Defendants did conspire to conceal the unlawful strip search and body cavity search of Mangual as set forth herein, and thereby violated his statutory, common law and constitutional rights.

**COUNT IV**
**Assault & Battery/Sexual Assault & Battery**
**Hanlon, Smith**

208. Each of the foregoing paragraphs is incorporated as if fully set forth herein.

209. These Defendants' committed the common law torts of assault and battery and/or sexual assault and battery against the plaintiff.

210. As a direct and proximate result thereof, the plaintiff's suffered harm and great pain of body and mind.

**COUNT V**
**Intentional Infliction of Emotional Distress**
**Sgt. Early, Hanlon, and Smith**

211. Plaintiff incorporates the above paragraphs by reference into this count as if fully set forth herein.

212. The conduct of these Defendants constituted intentional infliction of emotional distress.

213. By their vile and indecent actions, these defendants subjected Plaintiff to reprehensible conduct knowingly, intentionally, willfully, purposely, maliciously and with reckless

    disregard for the rights and well being of the plaintiff.

214. As a direct result of the intentional conduct of the defendants in this count, Plaintiff suffered severe emotional distress and great pain of body and mind.

## COUNT VI
### Federal Civil Rights Violation , 42 USC § 1983
### Sgt. Early, Hanlon, and Smith

215. Plaintiff incorporates the above paragraphs by reference into this count as if fully set forth herein.

216. The conduct of these Defendants constituted a violation of the Plaintiff's constitutional rights under the color of law.

217. As a direct and proximate cause result of the Defendants violations of his constitutional rights to due process and to be free of unreasonable search and seizure and excessive force, Mangual was assaulted and unlawfully searched by Sgt. Early, Hanlon, Smith and Lt. Assad in violation of 42 USC §1983.

## COUNT VII
### 42 USC § 1983, Supervisory and Monell Liability
### City of Worcester

218. Plaintiff incorporates the above paragraphs by reference as if fully set forth herein.

219. Prior to October 24, 2011, the City of Worcester developed and maintained policies and customs exhibiting deliberate indifference to the constitutional rights of persons in Worcester, which caused the violations of Plaintiffs' rights.

220. It was the policy and/or custom of the City of Worcester to inadequately and improperly investigates citizen complaints of police misconduct, and acts of misconduct were instead tolerated by the City of Worcester

221. It was the policy and/or custom the City of Worcester to inadequately supervise and train police officers, including the defendant officers, thereby failing to adequately discourage further constitutional violations on the part of its police officers. The city did not require appropriate in-service training or retraining of officers who were known to have engaged in police misconduct.

222. As result of the above described policies customs, police officers of the City of Worcester, including the defendant officers, believed that their actions would not be properly monitored by supervisory officers and misconduct would not be investigated or sanction, but would be tolerated.

223. The above described policies and customs demonstrated a deliberate indifference on the part of policymakers of the City of Worcester to the constitutional rights of persons within the city, and were the cause of violations of the Plaintiff's rights alleged herein.

224. The foregoing policies, customs and inactions by the City of Worcester were in whole or in part the moving forces behind the unlawful misconduct of the defendant officers Sgt Early, Hanlon, and Smith.

225. The conduct of the City of Worcester proximately caused Mangual's civil and common law rights violations complained of herein.

PRAYER FOR RELIEF

The Plaintiff respectfully requests the Court to order the following relief:

1. All compensatory damages recoverable;
2. All punitive damages recoverable;
3. All attorney's fees, costs and expenses allowable;
4. That defendants be found jointly and severally liable;
5. Any and all other relief as the Court deems just and proper.

<u>PLAINTIFF DEMANDS A JURY TRIAL AS TO ALL COUNTS IN THE COMPLAINT</u>

Respectfully submitted, Hector Mangual, Plaintiff By his attorney,

*/s/ Keith T. Higgins*
Keith T. Higgins, BBO 630249
Pawlak & Higgins, LLC
61 Academy Street
Fitchburg, MA 01420
Tel. (978) 345-5132
Fax (888) 443-1877

DATED: May 12, 2017